Filed 7/5/22  In re B.T. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re B.T., a Person Coming Under the Juvenile Court Law. | C094749 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> K.T., <br><br> Defendant and Appellant. | (Super. Ct. No. JD240034) |

Appellant K.T., father of the minor B.T. and one of her three siblings, appeals from the juvenile court's order terminating reunification services following a contested permanency hearing. (Welf. & Inst. Code, § 366.22.)[1] He contends there was not substantial evidence to support a finding that reasonable services had been provided as

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

1

the Sacramento County Department of Child, Family and Adult Services (Department) failed to facilitate father's visitation with the minor. We shall affirm the order.

## I.  BACKGROUND

### A.  *Initial Dependency Proceedings*

On August 19, 2019, the Department filed a petition alleging the minor, then eight years old, was described pursuant to section 300, subdivision (b), in that, L.C., mother of the minor, failed to protect her and her siblings by engaging in domestic violence with her husband in the presence of the minor and her siblings. On the same date, the Department filed a request to place B.T. and her siblings into protective custody due to the ongoing domestic violence in the home, which was granted.

On August 21, 2019, the Department filed a detention report requesting that the juvenile court order out-of-home placement of B.T. pending the jurisdiction/disposition hearing. B.T. reported seeing her stepfather choke mother when she was present. Father was contacted and reported he had concerns as he had not heard from mother since approximately August 5, 2019. Father stated he saw B.T. approximately two to three times per month and he spoke with her by telephone or text message regularly. On August 21, 2019, the juvenile court found father to be the provisionally presumed father of B.T. and her sibling A.T. On August 27, 2019, the juvenile court ordered out-of-home placement of the child pending the jurisdiction/disposition hearing.

### B.  *Jurisdiction and Disposition*

The jurisdiction/disposition report was filed on September 11, 2019. The report noted that father was ordered to receive visitation a minimum of two times per week, and he had been visiting with the children at the home of the maternal grandmother with no concerns. Visits were to be arranged and directed by the Department, supervised at the Department's discretion, and third party authorized. The Department also recommended the juvenile court sustain the petition, order out-of-home placement, and provide reunification services to mother and father. On September 17, 2019, the juvenile court

sustained the petitions and adjudged the minor a dependent of the court. All siblings were placed together.

C.     *Permanency Reports and Hearings*

The section 366.21, subdivision (e) report was filed on February 24, 2020, indicating the children remained placed together in the home of the maternal grandmother. The report noted that father was ordered to participate in individual counseling and parenting classes. As to parenting classes, father had completed 11 of 13 sessions and was eligible to make up the remaining two sessions in order to successfully complete the program. Father had not yet engaged in individual counseling as the social worker had not been able to meet with him. Father had been regularly visiting B.T. and was appropriate during the visits. The Department recommended continued reunification services for mother and father. On March 10, 2020, the juvenile court held the section 366.21, subdivision (e) hearing and determined that the parents had not been provided with reasonable reunification services.

The section 366.21, subdivision (f) report was filed on August 14, 2020, recommending continued reunification services for mother and father. Father had still only completed 11 of the 13 sessions of parenting education but had completed nine of 10 individual counseling sessions. Father also engaged in a domestic violence offender program and completed five of the required 12 sessions. As to visitation, father had "observed visitation" with B.T. and those visits were virtual due to the COVID-19 pandemic. The family service worker noted father had no bond with B.T., as B.T. and her sibling A.T. often refused to participate in virtual visits with father. The social worker requested to start in-person visits so that father could build a relationship with the children. Father had two positive in-person visits, however, the visits reverted to being virtual again due to the COVID-19 pandemic. The Department recommended continued out-of-home placement and continued reunification services for mother and father. On August 25, 2020, the juvenile court ordered continued services to mother and father.

3

The section 366.22 report was filed on January 29, 2021, recommending continued placement of B.T. with the maternal grandmother. It was reported father completed a domestic violence program on September 29, 2020, and his attendance and participation were positive and satisfactory. Father was having unsupervised visitation with B.T. once per week for four hours. The Department reported mother had continued to make progress and it would be appropriate to slowly transition the children to her home. An addendum report was filed on April 12, 2021, with updated information as to the plan for B.T. B.T. reported she wanted to stay with the maternal grandmother because she did not have a good relationship with her sisters, wanted to be independent of them, and felt more comfortable with the maternal grandmother. The Department reported it was in B.T.'s best interest to move forward with a plan of legal guardianship with the maternal grandmother. Mother requested a contested hearing on the recommendation as to B.T.

On May 24, 2021, an addendum to the section 366.22 report was filed with updated information as to B.T.'s wishes and visitation with father. It was noted that a child family team (CFT) meeting was held on May 7, 2021, to discuss visitation between father and B.T. and to help increase communication as all agreed it was important for B.T. to have a relationship with father. Father indicated he was open to starting off with virtual visits or telephone calls, and then build up to in-person visits. B.T. indicated she would like to start visits with father again but expressed her preference for starting with virtual visits and working toward in-person visits. B.T. said she did not want father to question why she did not want to see him before, and she just wanted to move forward and start over with visits with her father.

After the CFT meeting father typed an apology letter to B.T. and her sibling A.T. regarding an undisclosed issue that arose during the last visit. The social worker spoke with B.T., and she confirmed she wanted to remain with the maternal grandmother where she felt safer, liked her school, and liked her friends in her grandmother's neighborhood. B.T. reported she did not want in-person visits with father yet because she was not

4

comfortable. The maternal grandmother provided the social worker with B.T.'s phone number to provide to father, and further confirmed she was open to father spending B.T.'s birthday with them at an amusement park. On May 20, 2021, the maternal grandmother confirmed that B.T. and father had telephone calls but no in-person visits.

D.      *Contested Permanency Hearing*

On June 25, 2021, the juvenile court held a section 366.22 hearing. Father requested that B.T. be returned to mother, as there was no substantial risk of harm. Father also alleged that the Department failed to provide him with reasonable visitation. He contended the Department did not do enough to address B.T.'s reluctance to visit.

The maternal grandmother testified that she encouraged B.T. to visit with father and asked her what she could do to help, but B.T. indicated she didn't want to have father come visit. The maternal grandmother testified that she asked B.T. what happened at the last visit with father, and B.T. just said father was "scary," and he yelled at her. Father was also present for B.T.'s birthday, and B.T. said it was fine that he was there, but she "didn't really talk to him." The maternal grandmother testified she kept asking B.T. about the visits with father. She further testified she left it as B.T.'s option because it was her understanding she was not allowed to force them to visit. The maternal grandmother had a conversation with the social worker about B.T.'s stated desire not to visit with father, but did not discuss counseling for B.T. Finally, the maternal grandmother noted she had observed visits between B.T. and father, and B.T. would be happy to see father when he came to visit, but the interaction would pretty much stop there. She explained father would either be downstairs watching TV with her and the children, or "asleep on the floor or asleep on one of [the children's] beds."

After hearing testimony and argument, the juvenile court issued its ruling on August 2, 2021. A corrected minute order was issued on August 31, 2021, clarifying the juvenile court's order. The juvenile court explained that B.T. had been brought before the court as a result of domestic violence within her family. The juvenile court noted

5

B.T. felt safe in the home of the maternal grandmother because much of her childhood had been spent with her maternal grandmother versus her mother, combined with her exposure to violence in her mother's home. The juvenile court went on to explain that B.T.'s response to violence or discomfort was withdrawal, as evidenced by B.T. refusing to visit with father after he did something as simple as yelling at her during a visit.

The juvenile court determined that the evidence supported a finding that reasonable reunification services had been provided to father, reasoning: "As the father made progress in his reunification services, visitation was liberalized. At a visit, an incident occurred that resulted in [B.T.] not wanting to visit her father. The grandmother did her best to encourage [B.T.] to visit, and the father followed through with the CFT recommendation of writing to [B.T.] to re-establish contact, which did happen." The juvenile court terminated reunification services as to father and continued services for mother.

Father filed a notice of appeal.

## II. DISCUSSION

Father contends the juvenile court's finding that the Department provided him reasonable reunification services is not supported by substantial evidence. We disagree.

A parent is entitled to family reunification services, unless the court finds by clear and convincing evidence that providing such services would not be appropriate under a number of exceptions, none of which the court found to apply in this case. (See § 361.5, subds. (a)(1), (b), & (e).) "To promote reunification, visitation must be as frequent as possible, consistent with the well-being of the child." (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.)

When the juvenile court orders reunification services, the child welfare agency must tailor those services to the needs of the family and design them to alleviate the circumstances that gave rise to the child becoming a dependent of the court. (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1451.) The child welfare agency "must make a

6

good faith effort to develop and implement a family reunification plan. [Citation.] '[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult.' " (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345 (*Amanda H.*); see *In re K.C.* (2012) 212 Cal.App.4th 323, 329-330.) The agency must attempt to provide reasonable reunification services even if it is difficult to do so or the prospects of reunification are low at the time the court orders the services. (*In re Taylor J., supra,* at p. 1451; see *In re Alvin R.* (2003) 108 Cal.App.4th 962, 973 ["*Some* effort must be made to overcome obstacles to the provision of reunification services"].) The agency's efforts to provide reunification services do not have to be perfect, but they must be reasonable given the circumstances of the case. (*In re T.G.* (2010) 188 Cal.App.4th 687, 697.)

Before a court may terminate reunification services, it must find that the parent has been offered or provided reasonable reunification services. (*In re J.P.* (2014) 229 Cal.App.4th 108, 126.) We review the trial court's reasonable services findings for substantial evidence. (*Amanda H., supra*, 166 Cal.App.4th at p. 1346; *In re T.G., supra*, 188 Cal.App.4th at p. 697.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

Here, father contends the court erred in finding he was provided with reasonable services because he was denied visitation for a substantial portion of the reunification period and the Department did not adequately encourage visitation. However, the court never denied visitation. Nor did the Department fail to encourage visitation. To the contrary, the court consistently ordered that visitation occur. And both the Department and the maternal grandmother encouraged and facilitated the minor's visitation with father. Father had regular visitation with the minor, both virtually and in person,

throughout the dependency until a conflict between them arose during a visit around May 2021. The Department responded to the minor's refusal to visit with father by scheduling a CFT meeting, discussing the issue with the family, and both the minor and father indicated they were open to starting off with virtual visits or telephone calls to build back up to in-person visits. On May 20, 2021, about one month before the contested permanency hearing, the maternal grandmother confirmed that B.T. and father had telephone calls in accordance with the CFT plan, but no in-person visits. B.T. was simply not yet comfortable with resuming in-person visits by the time of the permanency hearing.

There is substantial evidence the Department's efforts were reasonable. When in-person visitation failed after an incident where father yelled at B.T., scaring her, the Department swiftly arranged a CFT meeting to address the issue and developed a plan to resume virtual and telephonic visitation until the minor was ready for in-person visits. The Department followed up with the maternal grandmother and father repeatedly to assure that they were following this plan. The reasons in-person visits ceased during the last couple of months leading up to the contested permanency hearing was not a result of any deficiency in the Department's efforts, but instead was a result of the minor's refusal to visit in person after father's conduct scared her. Accordingly, we conclude the Department made a good faith effort to develop and implement the reunification plan and assist father and B.T. with visitation. (See *Amanda H., supra*, 166 Cal.App.4th at p. 1345.)

Father further contends the juvenile court improperly delegated its power to decide whether visitation occurs to the minor. A juvenile court has a responsibility "to ensure [that] regular parent-child visitation occurs" (*In re S.H.* (2003) 111 Cal.App.4th 310, 317), and the court may not delegate "the power to decide whether *any* visitation occurs" to social workers, to therapists, or to the child himself (*id.* at p. 317; see *In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1504-1505). As long as the juvenile court's visitation

8

order does not expressly or implicitly grant a child a "veto power" over visits, the fact that a child refuses to attend certain visits does not constitute an impermissible delegation, at least without proof that the court failed to act when the child's refusals were brought to its attention. (*In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1046 (*Sofia M.*).)

Applying this standard, the juvenile court did not improperly delegate to the minor the power to veto visitation with father. The court's order did not expressly confer any such veto power, as it required visitation. And when B.T. initially voiced her objections to visitation, the Department arranged a CFT meeting, facilitated father's apology to B.T. for his behavior during the last in-person visit, and developed a plan to have virtual and telephonic visits to build back up to in-person visits. Father agreed to this plan. Indeed, he continued to have telephonic visits with her. He never raised with the court a concern about counseling for B.T. or the issue of her refusal to attend regular in-person visits.

Father argues that at least one case predating *Sofia M.* required a court to "enforce its visitation order" notwithstanding a child's refusal to attend visits. (*In re Hunter S., supra*, 142 Cal.App.4th at p. 1505.) *Sofia M.* rejected this earlier rule, reasoning that "the propriety of [a visitation] order" is distinct from its enforcement and that the prior case was incorrect to the extent it suggests that the juvenile court errs when the child refuses a proper visitation order. (*Sofia M., supra*, 24 Cal.App.5th at p. 1046.) *Sofia M.* instead placed the onus on the parent to bring the child's refusals to the court's attention, at which point the court must make "reasonable efforts" to secure visitation. (*Id.* at pp. 1046-1047.) We agree with *Sofia M.*'s approach, which obligates the court to make "reasonable efforts" once the parent objects to the child's refusal to visit. (*Id.* at p. 1047.) Father never objected. Father also notes the record is silent as to whether the Department considered therapeutic visitation or resuming counseling for B.T. However, these contentions are not availing because, when a child refuses visitation, "it is the parent's burden to request a specific type of enforcement, or a specific change to the visitation

order." (*Id.* at p. 1046.) Father did not request therapeutic visitation below, nor any other specific type of enforcement or modification. Accordingly, the court did not err in terminating reunification services.

### III. DISPOSITION

The juvenile court's order is affirmed.

/S/

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
RENNER, J.

We concur:

/S/

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
HOCH, Acting P. J.

/S/

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
KRAUSE, J.